UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL RICHARD LOMBARD,

                      Plaintiff,           Case No.: 11-cv-10033
                                        Honorable Gerald E. Rosen
        v.                      Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                      Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 11]**

Plaintiff Michael Richard Lombard brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [8, 11] which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

I.      **RECOMMENDATION**

For the reasons set forth below, this court finds that the Administrative Law Judge ("ALJ") incorrectly characterized the standard to qualify for a listed disability under §1.00 of the Social Security Administration's listing of impairments, *see* 20 CFR §404.1520(a)(4)(iii), and failed to consider a substantial number of material records of Lombard's treating physician, the absence of which greatly influenced his decision. As a result, remand is the most appropriate course of action. Accordingly, the court recommends GRANTING IN PART AND DENYING

IN PART Lombard's Motion for Summary Judgment [8], DENYING the Commissioner's Motion for Summary Judgment [11], and REMANDING this case back to the ALJ for further proceedings consistent with this Report and Recommendation.

## II.    REPORT

### A.    Procedural History

On August 16, 2007, Lombard filed applications for DIB and SSI, alleging disability as of January 1, 2006.  (Tr. 137-149).  The claims were denied initially on October 22, 2007.  (Tr. 70-72).  Thereafter, Lombard filed a timely request for an administrative hearing, which was held on November 16, 2009, before ALJ John Kraybill.  (Tr. 46-69).  Lombard, represented by attorney Charles Palmer, testified, as did medical expert ("ME") James McKenna, M.D. and vocational expert ("VE") Michelle Peters.  (*Id.*).  On May 14, 2010, the ALJ found Lombard not disabled.  (Tr. 9-23).  On November 24, 2010, the Appeals Council denied review.  (Tr. 1-3).  Lombard filed for judicial review of the final decision on January 4, 2011.

### B.    Background

#### 1.    *Disability Reports*

According to a disability report filed on August 16, 2007, Lombard suffers from the following impairments: triple fusion at the L5-S1 vertebrae, nerve damage and severe migraine headaches.  (Tr. 194).  He reported that he was in constant pain, could not be in the same position for more than fifteen minutes and could only drive short distances.  (*Id.*).  He reported taking the following medications Vicodin and Motrin 800 for his pain, Valium to relax his muscles to sleep, and Relapax and Delata for his migraines.  (Tr. 198).  After his alleged onset date he continued to work as a carpenter foreman, with restrictions, but when his company began to go out of business there became fewer and fewer tasks he could perform as restricted, and

2

ultimately he was laid off.  (*Id.*).  When he was still working after his alleged onset date, he had

an apprentice who helped him, and his work was "very sporadic;" he was "called in when there

was a job [he] could do."  (Tr. 180-82).  He never worked more than a few days at a time.  (Tr.

186).  During an in-person interview, the Social Security Administration representative

documented that Lombard had difficulty with sitting, standing and walking.  (Tr. 191).  The

representative observed that Lombard "could only sit for a few minutes," and "appeared in

constant pain.  [He] stood leaning over resting his arms on the counter."  (*Id.*).

In a functional report dated August 24, 2007, Lombard reported that his daily activities

included driving his children to their activities, cleaning up the house, tinkering in his wood

shop, napping around 1 p.m., making dinner, getting his kids to help with laundry and chores,

grocery shopping, checking on the grandparents, and doing odd jobs for his uncle.  (Tr. 209).

Divorced, he was the primary caregiver for his two sons, ages 10 and 14, though his ex-wife

helped out at times.  (Tr. 193; 209-210).  He reported that he would sleep hard for about four

hours at the start of the night, then would toss and turn for the rest of the night.  (Tr. 210).  He

reported difficulties with washing the bottoms of his feet and putting on socks and shoes.  (*Id.*).

Lombard reported that he and his sons (and at times his ex-wife) would do all of the household

chores including cleaning, laundry, mowing, repairs, but that he could not clean the tub or the

toilets or wash the dog.  (Tr. 211).  He reported he was able to drive to get groceries and visit

with family and friends.  (Tr. 212).  He would also attend his sons' sporting events, though he

reported that the seating arrangements made that difficult.  (Tr. 213).  He reported difficulties

with lifting, squatting, bending, standing, sitting, kneeling and stair climbing.  He stated he could

not sit or stand for longer than 15-20 minutes, and could only walk for about 20 minutes before

having to stop.  (Tr. 214).  He reported that after being laid off from his job, he had been unable

"to find an employer that has been able to accommodate [sic] my lifetime restrictions."  (Tr. 216).

In a disability appeals report filed on December 6, 2007, Lombard reported that his condition had worsened in that the discs above his fusion were herniated and he now had a tingling sensation in his arms and legs when he coughed.  (Tr. 222).  He reported that he could no longer walk his dog or play with his kids.  (Tr. 225).

### 2. *Plaintiff's Testimony*

In 1997, Lombard suffered a 10-14-foot fall from a ladder while working as a carpenter, landing on his lumbrosacral area. (Tr. 242, 248).  After his first surgery in 1998, Lombard went back to work for about 18 months.  (Tr. 53).  He was able to return to work again after his last surgery, a fusion, for a short time before having to stop because of his back pain and increased migraines.  (*Id.*).  He testified that after he stopped working as a carpenter, he attempted other jobs including as a telemarketer and a car porter, but that he could not sustain that work because of the prolonged sitting or standing.  (Tr. 55).  At the hearing, Lombard testified that he stopped working in December of 2005 because he could not handle it anymore.  (Tr. 50).  He still maintained the work restrictions that his doctor had previously placed on him, which included no bending, stooping, working off ladders; no prolonged sitting, standing and no lifting over 20 pounds.  (Tr. 51).

Lombard testified that he lived in a single family home with his wife and his two sons. (Tr. 49).  His bedroom was upstairs, and he used handrails on either side to get up and down the stairs.  (Tr. 52).  He occasionally cooks breakfast and dinner.  (*Id.*).  Lombard testified that he takes Vicodin two to three times a day, Valium, and Klonopin at night.  (*Id.*)  He also takes Cataflam at the onset of migraines and Dilaudid on his bad days.  (*Id.*).  He testified that he had constant pain but that it varied between good and bad days, and that he had 70% good days.  (Tr.

4

55).  On his good days his pain was between a 4 and a 5 (presumably out of 10).  (*Id.;* Plt. Brf., p. 3).  He testified that bad days were brought on by activity ranging from sitting too long, to attempting to rake leaves, to one time sneezing the "wrong way."  (Tr. 56).  On those days, his toes would go numb and his pain would extend to his neck and shoulders.  (*Id.*).  In addition to pain medication, he testified to using ice and a leg wedge approximately twice a day, in the afternoon and at night.  (Tr. 57).

Lombard testified that his normal daily routine consisted of going to his grandfather's to make sure he is taking his medicine and breakfast, watching TV, using the computer or tinkering in his wood shop.  (Tr. 54).  Then he would take a nap and when his kids returned from school he would take them to their sporting events.  (*Id.*).  He would make dinner, and then lay down on ice for a while before helping his kids with their homework.  (*Id.*).  He attended his children's sporting events, but could not sit on the benches for a long time and had to alternate between sitting and standing.  (*Id.*).  His sons do chores like cutting the grass.  (Tr. 52).  He testified that he would sleep approximately 4-5 hours a night, and nap an hour during the day while lying on ice.  (Tr. 58).

Lombard testified that he could comfortably sit about 20 minutes before having to get up and stand, lean against a wall or kneel against the wall.  (Tr. 57).  He could stand for approximately the same amount of time.  (*Id.*).  When asked how long he could sustain repeated changes in sitting and standing, Lombard testified, "Well, getting up and down is strenuous as it is, so I only do it to alleviate the different pains.  It's a different kind of pain sitting than it is standing, so, I mean, to do it constantly, every 20 minutes, a few hours maybe."  (*Id.*).  When asked if he could do it six hours out of an eight-hour day he said no.  (*Id.*).  When asked if he did anything in his regular routine where he was sitting or standing, or both, six hours at a time, he

said no, because doing so caused him too much pain.  (Tr. 58).  During the medical expert's testimony, Lombard asked the ALJ if he could stand.  (Tr. 62).

### 3. Medical Evidence

#### a. Treating Sources

After his injury in 1997, Lombard began seeing Dr. Gregory Guyon ("Dr. Guyon"), a physiatrist, for his symptoms.  Lombard's major complaints were lower back pain with radiculopathy down his left leg, and severe headaches, some of which sent him to the emergency room.  (*See e.g.* Tr. 278-339; 431-456).  After three lower back surgeries between 1998 and 2001, the last of which fused his L4-S1 vertebrae, (Tr. 479-84; 322; 373-78), and a course of occupational therapy, (Tr. 398-400), Lombard returned to work in December 2002 with the restriction that he not lift more than 40 pounds.  (Tr. 405-406).

However, in February 2003, Dr. Guyon again removed Lombard from work in after his pain returned.  (Tr. 412).  He returned to work in March of that year with the following restrictions: a sedentary job with no lifting at or above the shoulder level, or at or below the knee level and no kneeling, squatting, pushing or pulling.  (Tr. 422).  In addition, he required a sit/stand/lie down option on an hourly basis and was restricted to lifting 12-15 pounds infrequently, 7-12 pounds occasionally, and 5 pounds or less frequently.  (*Id.*).

Dr. Guyon's treating records resume in 2005, where he continued to note Lombard's complaints of lower back pain and headaches.  (Tr. 527-533).  He also noted several headaches a month during this time.  (*Id.*).  Physical exams conducted during this time appear to corroborate Lombard's subjective complaints (*See e.g.* Tr. 532; 528).  Dr. Guyon prescribed the following medications over this time period:  Valium, Klonopin, Lortab and Vicodin for Lombard's back pain, and Cataflam and Dilaudid for his headaches.  (Tr. 527-33; 540-43).  Lombard also

6

received a steroid block during this period for his back pain.  (Tr. 533).

Importantly, it is clear that after his alleged onset date, Lombard continued to be treated by Dr. Guyon.  The record includes treating notes from eleven different appointments with Dr. Guyon between January 30, 2006 and May 11, 2009, all of which are in handwritten form only. (Tr. 521-526; 564; 581-584).  While not easy to read, they appear to document continued complaints of lower back pain, upper back and neck pain, radiculopathy and headaches.  (*Id.*)  It appears that Dr. Guyon physically examined Lombard at each appointment by conducting various physiological tests like straight leg raising tests, pelvic rotation tests and deep tissue reflex tests.  Dr. Guyon continued to prescribe all of the same medication to Lombard during this time, as well as prescribing Motrin 800, Levectin and Aviza.  (Tr. 534-539).

On November 13, 2009, Dr. Guyon wrote a letter to Lombard's counsel summarizing his findings and treatment.   (Tr. 582-585).   Dr. Guyon noted that Lombard needed therapy interventions, and might need further surgical interventions due to a "disc herniation at the L3, 4 interspace," but that because Lombard lacked health insurance, no recent imaging had been done. (Tr. 584-85).  Dr. Guyon concluded that:

> at this point in time I would recommend that given his significant physical impairments and his numerous physical findings, as documented in his chart, [Lombard] should be considered totally disabled.  I do not believe that he is even capable of doing a sedentary job.  He has difficulty with prolonged sitting and standing.  He cannot do climbing, crawling, reaching, pushing or pulling activities.

(Tr. 584).

### b.    *Consultative and Non-Examining Sources*

On October 15, 2007, a consultive exam was performed by Dr. Jai Prasad for the State of Michigan.  (Tr. 546-553).  Dr. Prasad documented that Lombard complained of low back pain, peripheral nerve damage and migraines.  (Tr. 546).  Dr. Prasad noted that during the exam

Lombard appeared "obviously in pain," and that he was "constantly changing positions during the examination when sitting." (Tr. 547). Upon examination, Dr. Prasad documented a straight leg raising test between 0 and 30 degrees. He found Lombard's gait normal and stable and that he did not use ambulatory aids. (Tr. 548). He found no issues in Lombard's upper extremities and his grip and pinch strength were excellent. (*Id.*). Lombard's lumbar spine flexation was 0-45 degrees, extension was 0 degrees, right lateral flexation was 0 degrees and left lateral flexation 0-15 degrees. (*Id.*). Dr. Prasad found that Lombard could sit for about 10 minutes before having to change positions, stand for approximately 30 minutes, carry 15 pounds, climb approximately 12 stairs, but could not bend, stoop or squat. (Tr. 552).

On October 22, 2007, Christine Brennan (credentials unknown) conducted a residual functional capacity assessment ("RFC") of Lombard. (Tr. 554-561). She found that he could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk six hours out of an eight-hour day, sit approximately that same amount (provided he had the ability to alternate between sitting and standing), and had unlimited ability to push or pull. (Tr. 555). He was also limited to only occasionally climbing stairs, balancing, stooping, kneeling, crouching or crawling, and he could never climb ladders, ropes or scaffolding, and he was to avoid hazards. (Tr. 556, 558).

On January 7, 2010, at the request of the ALJ post-hearing, an EMG and nerve conduction study was performed by Dr. Mary Ann Guyon, M.D. ("Dr. M.A. Guyon").[1] Dr. M.A. Guyon noted that Lombard reported back pain with radiculopathy between his shoulder blades and his legs, and headaches that had been plaguing him since a spinal fluid leak after his first surgery. (Tr. 593). Upon physical exam, Dr. M.A. Guyon noted that Lombard had

---

[1] Dr. M.A. Guyon is Dr. Guyon's mother. (Plt. Brf., p. 5).

decreased muscle tone and girth in his left thigh and calf, decreased sensation in his lower extremities, and a positive straight-leg raising test on his left leg. (Tr. 593). The EMG indicated acute changes in the L4-L5 and L5-S1 vertebrae, with the chronic changes more in the left than the right. (Tr. 594). The nerve conduction study found mild asymmetric prolongation of left H-reflex compatible with left L-5 nerve root impairment. (*Id.*). Dr. M.A. Guyon's overall impression was bilateral L5 and left S1 radiculopathy. (*Id.*).

A consultive exam, ordered by the ALJ post-hearing, was conducted by Elizabeth Edmond, M.D. on March 5, 2010. (Tr. 611-23). Dr. Edmond noted that Lombard reported consistent back pain unrelieved by his prior surgeries, with radiculopathy in his left leg, and, more recently, his right leg. (Tr. 611). He reported radiating pain in his arms when he sneezed or coughed. (*Id.*). He also reported a history of headaches, which included a recent trip to the emergency room. (Tr. 639). Dr. Edmond noted some of Lombard's medical history in her report, but her recounting of his treatment by Dr. Guyon ended with an appointment in 2005 and then jumped to the letter he authored in 2009 (Tr. 582-85). (Tr. 612-613).

Upon exam, Dr. Edmond found that Lombard had a normal heel-toe sequence on gait, could stand on alternating legs, heels and toes, could squat and tandem walk, although he was slow in squatting and tandem walking. (Tr. 613). She found a slight curvature to his spine to the left in the thoracic area and the lumbar area, and a true restriction in the range of motion of his lumbar spine. (Tr. 614). He had a full range of motion in his cervical spine and in his hips, knees and ankles. (*Id.*). He also had a grip strength in both hands of 27 kilograms. (*Id.*). His deep tendon reflexes were +1 in his left leg and his upper extremities, but unobtainable in his right leg. (*Id.*). A straight leg raising test was negative on the right side, but produced pain on the left. (Tr. 613). Dr. Edmond diagnosed him with failed back syndrome secondary to his

9

surgeries.  (*Id.*).  She found that Lombard could lift and carry up to 10 pounds occasionally from table level; he could sit, stand and walk one hour each at a time, and three hours each over the course of an eight-hour day; he could occasionally reach overhead (without weight), and frequently reach not overhead, and he could occasionally push and pull with weight limits.  (Tr. 613-617).  He could occasionally operate foot controls, occasionally climb stairs and ramps, but never ladders or scaffolds, and could not balance, stoop, kneel, crouch or crawl.  (Tr. 617-18). He needed to avoid hazards like heights and moving mechanical parts, but could occasionally operate a motor vehicle.  (Tr. 620).  While she checked off that he could walk at a reasonable pace on rough or uneven surfaces, she qualified this with the notation "may be slow."  (Tr. 621).

### 4. *Medical Expert's Testimony*

Dr. Herman McKenna testified at the hearing as an independent medical expert.  He began by asking Lombard whether he had had any recent imaging done, including an EMG, an MRI or a CT, to which Lombard responded he was not sure.  (Tr. 60).  Dr. McKenna then testified that he did not believe there was sufficient objective medical evidence in the record to allow him to form an opinion about Lombard's medical status.  He testified that, similar to Dr. Guyon's finding in his November 2009 letter, Dr. McKenna felt "handcuffed" in the fact that there are no recent objective tests.  (Tr. 61).  He testified that without an EMG or a nerve conduction study he could not tell whether the S-1 nerve root was being entrapped, or whether there was any objective evidence of radiculopathy or radiculitis.  (*Id.*).  Without such evidence to show entrapment or constriction of the S-1 nerve root, Dr. McKenna testified that he could not form an opinion as to whether Lombard's condition met or medically equaled a listed disability. (Tr. 63).  He testified that if there was evidence of S-1 nerve root entrapment "he could be in a [sic] running for a meeting or equaling" of a listed impairment.  (Tr. 63).  Absent additional

medical evidence, Dr. McKenna testified that he would assess Lombard's residual functional capacity as requiring a sit/stand option, being able to lift 20 pounds from a sedentary low occasionally, 10 pounds frequently, bending and stooping on an occasional basis, no ropes, ladders or scaffolds, and stairs on a very occasional basis.  (Tr. 64).

5.     *Vocational Expert's Testimony*

VE Michele Deers testified that based on the testimony she had heard and examination of the record, Lombard's previous positions as a carpenter and a foreman were skilled heavy and light occupations, respectively.  (Tr. 66).  There would be no transferrable skills to sedentary work.  (*Id.*).  The ALJ then asked a hypothetical of the VE, which was not fully transcribed, but which appears to have included limitations to sedentary work, with a sit/stand option, no ladders, scaffolds or ropes, and no more than two or three "steps" (presumably stairs).  (*Id.*).  The VE testified that given the hypothetical there would be approximately 980 assembly positions, 850 packaging-type positions and 900 information clerk positions available to Lombard.  When asked by counsel if Lombard's need to lie on his back for an hour in a typical work day to ice his back would preclude those jobs, the VE testified that it would.  (Tr. 67).

## C.     **Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

11

application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The ALJ's Findings

Using the five-step sequential analysis, the ALJ found Lombard not disabled. (Tr. 12-19). At Step One, the ALJ determined that Lombard had not engaged in substantial gainful activity since his alleged onset date. (Tr. 14). At Step Two, the ALJ found the following severe impairments: chronic lumbar back pain, status post laminectomy and fusion, lumbar radiculopathy, and migraine headaches. (*Id.*). At Step Three, the ALJ determined that

12

Lombard's impairments did not meet or medically equal one of the listed impairments under §

1.00 because the medical evidence did not support a conclusion that he was not able to ambulate

effectively.  (Tr. 14-15).  The ALJ then assessed Lombard's RFC, finding that he could:

> perform sedentary work except that he requires the option to alternate
> between sitting and standing positions at will and should avoid bending,
> stooping, climbing ropes, ladders or scaffolds.  The claimant should also
> engage in stair climbing on less than an occasional basis.

(Tr. 15).  In support of his RFC assessment, the ALJ cited certain medical evidence in the record,

including the various consultive exams.  (Tr. 15-16).  The ALJ then addressed Dr. Guyon's

treatment records.  The ALJ found that "**[a]fter the claimant's alleged onset date, the first

time the claimant saw Dr. Guyon was in November of 2009**."  (Tr. 16) (emphasis added).  He

then stated that he was giving Dr. Guyon's November 2009 letter:

> some weight in the decision, **except that Dr. Guyon has not treated
> claimant on a regular basis since prior to his alleged onset date.**  Dr.
> Guyon asserts that the claimant can no longer afford the care that he
> needs, but regardless of that, **Dr. Guyon has not fully examined the
> claimant since prior to his alleged onset date**.
>
> * * * *
>
> There is no record that the claimant has ever needed to go to the
> emergency room for his migraine headaches . . . .  **There is also no
> indication of persistent complaints of headaches**.  The claimant
> received relatively little medical care despite his allegations of disabling
> pain.  The claimant's primary physician was Dr. Guyon, **but the claimant
> only saw Dr. Guyon prior to his alleged onset day.  Dr. Guyon did not
> make any reference to headaches.**

(Tr. 16-17).[2]  The ALJ then cited the testimony of the medical expert, and the limitations he

imposed.  The ALJ found that "there is no evidence in the record that contradicts the medical

expert's opinion, including that of Dr. Guyon as described above."  (Tr. 17).  The ALJ found

Lombard less than credible to the extent his testimony conflicted with the RFC.  He noted that

---

[2] As discussed below, each of the ALJ's bolded, underlined findings are inaccurate.

Lombard had "relatively good activities of daily living," and that if he had not been laid off from his job, "he would presumably continue to work." (*Id.*). The ALJ found no objective evidence to suggest that Lombard was incapable of sedentary work. (*Id.*).

At Step Four, the ALJ found that Lombard was unable to return to his past relevant work. (Tr. 17). At Step Five, he found that given Lombard's age, education, work experience and RFC assessment, there were a significant number of jobs he could perform, including assembler, packer, and information clerk, thus a finding of not disabled was warranted. (Tr. 17-18)

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486

14

F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

### F.     Analysis

Lombard makes two arguments, both of which the court finds persuasive.  First, he argues that the ALJ erred when he did not find that Lombard met or medically equaled a listed disability.  Second, he argues that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ's decision demonstrates he did not review any of Dr. Guyon's records from after Lombard's alleged onset date.  The court takes each argument in turn.

### 1.     The ALJ Erred by Applying the Wrong Criteria to Conclude That Lombard Did Not Meet Any of the Disability Listings Under Listing 1.00.

Lombard argues that the ALJ erred in finding that his condition did not meet, or

medically equal, listing 1.04A.  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04A.  The

real problem, however, is that the ALJ never made ***any*** assessment regarding 1.04A.  At Step

Three, the ALJ stated that he "specifically considered the claimant's impairments under section

1.00" and determined that they did not meet any of those listings.  (Tr. 15).  But the ALJ's

determination was based on his finding that none of Lombard's impairments rendered him

unable to ambulate effectively:

> The claimant does not have a herniated nucleus pulosus, spinal arachnoiditis,
> spinal stenosis, osteoarthritis, degenerate disc disease, fact arthritis, or vertebral
> fracture that results in compromise of a nerve root (including the cauda equina) or
> the spinal cord AND results in an inability to ambulate effectively.  He is capable
> of sustaining a reasonable walking pace over a sufficient distance and performing
> fine and gross manipulations to be able to carry out activities of daily living.

(*Id.*) (emphasis in original).  The ALJ's use of the conjunctive "and" essentially turned an

"inability to ambulate" into a necessary predicate for meeting all of the listings under 1.00.  That

was clear error because only one of the three ***alternative*** components of listing 1.04 actually

requires an inability to ambulate effectively:

> 1.04   Disorders of the spine of the spine (e.g. herniated nucleus pulosus,
> spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerate disc disease,
> fact arthritis, or vertebral fracture), resulting in compromise of a nerve
> root (including the cauda equina) or the spinal cord.  With:
>
> A.      Evidence of a nerve root compression characterized by
> neuro-anatomic distribution of pain, limitation of motion of the spine,
> motor loss (atrophy with associated muscle weakness or muscle weakness)
> accompanied by sensory or reflex loss and, if there is involvement of the
> lower back, positive straight-leg raising test (sitting and supine);
>
> ***OR***
>
> B.      Spinal arachnoiditis, confirmed by an operative note or
> pathology report of tissue biopsy, or by appropriate medically acceptable
> imaging, manifested by severe burning or painful dysesthesia, resulting in
> the need for changes in position or posture more than once every 2 hours;
>
> ***OR***

C.     Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, *and resulting in inability to ambulate effectively*, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 1.04A, B and C (emphasis supplied).  While 1.04C requires an inability to ambulate effectively, 1.04A and 1.04B do not.  *Id.*  Thus, a finding that Lombard could ambulate effectively did not preclude a finding that his impairments satisfied the listings in either 1.04A or 1.04B.  The ALJ's contrary conclusion, and his resulting failure to consider the evidence as it relates to the specific requirements of those listings, were clearly erroneous and prejudicial to Lombard.

The court rejects the Commissioner's arguments as to why Lombard supposedly does not meet the criteria in listing 1.04A.  (Def. Brf. at 17-18).  The court will not engage in such a *post hoc* justification of an ALJ's clearly legally deficient decision.  *See S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947) (a reviewing court must judge propriety of agency action "solely by the grounds invoked by the agency"); *see also Hunter v. Astrue*, No. 09-2790, 2011 U.S. Dist. LEXIS 148585 at *11 (N.D. Ohio Dec. 20, 2011) (remanding case where Commissioner attempted to rationalize on appeal insufficient examination of evidence by ALJ).  While it is possible that the ALJ did not believe Lombard met the criteria under either listing 1.04A or B, notwithstanding his ability to ambulate effectively, it is equally possible that the ALJ either did not consider that specific question or believed that Lombard met the other criteria of one of the listings except for the ambulation requirement.  Because the ALJ failed to apply the correct legal standard, it is impossible for this court to say what his finding was, let alone whether or not his finding is supported by substantial evidence.  That this error is not harmless is apparent on its face, but is also bolstered by Dr. McKenna's testimony that the subsequent testing results may show that

17

Lombard meets one of the listings criteria. (Tr. 63); *Stacy v. Comm'r of Soc. Sec.*, No. 10-3518, 2011 U.S. App. LEXIS 25269 at *7-8 (6th Cir. Dec. 19, 2011) (internal citations omitted) (error harmless only where remand would be "an idle and useless formality" as there would be no reason to believe that it "might lead to a different result").

      2.    *The ALJ Erred by Failing to Consider Numerous Treating Physician Records*

Lombard argues that the ALJ further erred by not considering any of his treating physician's notes from the time period beginning with Lombard's alleged onset date. As noted above, Lombard's treating physician, Dr. Guyon, wrote a letter in November 2009, summarizing his treatment of Lombard since 1997 and concluding that he believed Lombard's condition had worsened to the point where he could not now even perform sedentary work. (Tr. 584). The ALJ stated in his decision that he gave Dr. Guyon's opinion only "some weight," because Dr. Guyon purportedly had "not treated [Lombard] on a regular basis since prior to his alleged onset date." (Tr. 16). But the records demonstrate that Dr. Guyon did treat Lombard on a regular basis after the alleged onset date; in fact, there are records from eleven separate appointments over a three-and-a-half year period after that point in time where Dr. Guyon not only met with Lombard, but physically examined him and continued to prescribe and manage his medications. (Tr. 521-26; 564; 581-84).

The Commissioner argues that any failure by the ALJ to consider these records was harmless because the ALJ's ultimate RFC assessment "was not significantly different" from Dr. Guyon's opinion. (Def. Brf. at 9-10). The court disagrees. Dr. Guyon opined that Lombard's recent medical history rendered him incapable of doing even sedentary work, (Tr. 584), a finding which is directly at odds with the ALJ's finding that Lombard could "perform sedentary work except that he requires [a sit/stand] option…" (Tr. 15).

18

The records from Dr. Guyon that span the time from January 2006 until May 2009, while handwritten and not particularly easy to decipher, appear to document a progressive decline in Lombard's condition.   (Tr. 521-526; 564; 578-581).   At the beginning of these records Dr. Guyon notes that Lombard's primary complaints are constant low back pain with pain traveling down the left leg and headaches, (Tr. 524-526).   By the end of the treating records, Dr. Guyon is documenting complaints of pain that travels not only down to the legs but up the spine to the scapula or neck, as well as jolts of pain and numbness in his hands and fingers when coughing. (Tr. 564; 578-581).   It also appears that Dr. Guyon noted absent deep tissue reflexes on Lombard's left side, as well as positive straight-leg raising tests at points over this period as well. (Tr. 564; 579; 581).

Had the ALJ considered these records, he may well have given more, possibly even controlling weight to Dr. Guyon's November 2009 opinion.   That possibility is enhanced given the factors the ALJ must consider when evaluating a treating physician's opinion.   *See* 20 C.F.R. § 404.1527(d).   Furthermore, had the ALJ evaluated the records, he would have seen Lombard's reports about his need to lie down often, (Tr. 580), and Dr. Guyon's recommendation that Lombard ice his back frequently, (Tr. 521; 523-24; 526; 578).   That evidence may have heightened the ALJ's view of Lombard's credibility, which he had otherwise deemed lacking, (Tr. 16-17), and may have affected the RFC assessment he ultimately issued.

The ALJ appears to have made a similar error with respect to Lombard's claimed severe headaches.   Although Lombard testified as to his headaches, the ALJ determined that his subjective claims were not substantiated by the record:

> There is no record … of persistent complaints of headaches.  [Lombard] received relatively little medical care despite his allegation of disabling pain.  The claimant's primary physician was Dr. Guyon, but [Lombard] only saw Dr. Guyon prior to his alleged onset day.  Dr. Guyon did not

make any reference to headaches.

(Tr. 17).  The ALJ's findings were doubly wrong.  Not only do the records show that Lombard saw Dr. Guyon at least eleven times after his alleged onset date, but Dr. Guyon's treatment notes from nine of those eleven visits specifically reference Lombard's headaches.  (Tr. 521-525; 578-581).  For example, at an appointment on March 11, 2008, Dr. Guyon noted that Lombard reported an on and off headache that had existed for six weeks.  (Tr. 581).  Dr. Guyon noted that Lombard took Dilaudid several times a month to stay out of the ER.  (*Id.*).  On May 11, 2009, Dr. Guyon continued to note occasional headaches in Lombard's chart.  (Tr. 578).  This evidence would have supported Lombard's subjective testimony about the nature and severity of his headaches, and thus could have affected the ALJ's RFC assessment and/or his ultimate disability determination.

Finally, the last set of work-related restrictions Dr. Guyon placed on Lombard was more restrictive than the restrictions the ALJ found here.  As noted above, in March 2003, Dr. Guyon permitted Lombard to return to light duty sedentary work, but restricted him to a sit/stand/lie-down option, as well as no lifting at or above the shoulder level, no kneeling, squatting, pushing or pulling.  This requirement for a lie-down option is more restrictive than the sit/stand option that the ALJ found.  While it was issued prior to Lombard's alleged onset date, Lombard testified at the hearing that he remained under those same restrictions at the time of the hearing.  (Tr. 51).  Had the ALJ considered Dr. Guyon's more recent treating records, he likely would have given his overall opinion, including his previously issued restrictions, more weight than he did.

In sum, because he erroneously believed they did not exist, the ALJ failed to consider numerous substantive and material treatment notes from a critical time period with Lombard's long-term treating physician.  The ALJ also cited, on more than one occasion, the purported lack

of those notes to support his findings.  Clearly, had the ALJ considered those notes, the outcome of his decision may well have been different.  Therefore the ALJ's error cannot be deemed harmless.  *See Stacy*, 2011 U.S. App. LEXIS 25269 at *7-8.

3.    *The Court Recommends Remand, Rather than an Award of Benefits*

In addition to asking the court to "reverse the ALJ decision," Lombard asks the court to "enter an award of benefits" in his favor.  (Doc. #8, p. 20) ("Given the errors of the ALJ, the overwhelming evidence of disability, and the fact that substantial evidence supports plaintiff meeting Listing 1.04(A), this Court should not only reverse the ALJ decision, but enter an award of benefits [to] the plaintiff.").  The court declines to usurp the ALJ's role, and instead finds that remand is the proper course of action so that the ALJ can make a full and fair determination as to whether Lombard is entitled to benefits.

The Sixth Circuit has held that "only when 'all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits' should a court reverse an ALJ's decision and immediately award benefits."  *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994) *quoting Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 175 (6th Cir. 1994).  Otherwise, the proper course is to remand the case back to the ALJ.  *Id.  See also Martin v. Comm'r of Soc. Sec.*, 61 Fed. Appx. 191 (Moore J., dissenting) (quoting *Iognia v. Califano*, 568 F.2d 1383, 1387 (D.C. Cir. 1977)) (noting that a court has the authority to remand a case under sentence four *sua sponte*); *Wenzlick v. Astrue*, No. 08-12414, 2009 U.S. Dist. LEXIS 77154 at *4-5 (E.D. Mich. Aug. 28,. 2009) (noting in *dicta* magistrate's *sua sponte* remand appropriate, though deciding the case on other grounds); *Lebron v. Barnhart*, 2007 U.S. Dist. LEXIS 33410 at *18-19 (S.D.N.Y. Apr. 26, 2007).  Here, because the ALJ failed to (1) apply the correct legal standard; (2) properly consider the factors required under listing 1.04A or B; and (3)

21

consider a number of material treating physician records, the court finds that factual questions remain that must be resolved by the ALJ before it can be determined whether Lombard is entitled to an award of benefits. *Newkirk*, 25 F.3d at 318; *Faucher*, 17 F.3d at 175

Accordingly, the court recommends: (1) granting Lombard's request to reverse the ALJ decision; (2) denying Lombard's request to enter an award of benefits; and (3) remanding the case back to the ALJ for further proceedings consistent with this Report and Recommendation.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS GRANTING IN PART AND DENYING IN PART Lombard's Motion for Summary Judgment [8], DENYING the Commissioner's Motion for Summary Judgment [11], and REMANDING this case back to the ALJ for further proceedings consistent with this Report and Recommendation.

Dated: February 13, 2012                           s/David R. Grand
Ann Arbor, Michigan                                DAVID R. GRAND
                                                   United States Magistrate Judge

## <u>NOTICE</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v.*

22

*Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 13, 2012.

s/Felicia M. Moses

FELICIA M. MOSES
Case Manager
